Randall E. **HENDRICKS** and **Joann Marinelli Hendricks, Plaintiffs,**

v.

The **UNITED STATES, Defendant.**

No. 9–84L.

United States Claims Court.

Dec. 17, 1987.

Randall E. Hendricks, Kansas City, Mo., pro se.

David F. Shuey, Washington, D.C., for defendant, with Michele A. Giusiana, of counsel.

## OPINION

MOODY R. TIDWELL, III, Judge:

This case came before the court on plaintiffs' claim of taking without just compensation of the economic remainder of land encumbered with flowage easements purchased by the United States, acting through the U.S. Army Corps of Engineers. The flowage easements permitted the Corps to occasionally flood plaintiffs' land without incurring liability. Plaintiff, Randall Hendricks, a practicing attorney appearing *pro se,* and his wife purchased two tracts of land predominantly encumbered with flowage easements with the intent to use the land as a cattle stock farm.[1] Plaintiffs claimed that during 1981–1986 the Corps' use of the flowage easements rendered their land worthless for any purpose and has destroyed the market value of

---

1. Joe Hendricks, plaintiff Randall Hendricks' father, is a silent partner in the investment. At trial their partnership in this undertaking was described as an unwritten father and son, 50–50, business relationship.

the land. In addition, plaintiffs pray for just compensation for the taking, by the same cause, of crops destroyed in 1981–1983 in the amount of $187,066.52. Plaintiffs also requested interest on the amounts claimed, costs and attorneys fees. Defendant denied liability under the terms of the flowage easements, arguing that there was no destruction of the economic remainder of the land, and that the flooding was primarily caused by high rainfall in the area and the resulting flood water in Clear Creek which runs partly adjacent to and on plaintiffs' property and in the Osage River, a mile and one-half downstream.

## FACTS

Construction of the Harry S. Truman Dam and Reservoir was authorized by the Congress of the United States in 1954. Construction began in 1964 and closure of the reservoir occurred in 1977. By the end of 1979 the reservoir had reached the planned multipurpose elevation depth of 706′ above mean sea level. The dam is a multipurpose dam designed for flood control, generation of hydroelectric power and protection of fish and wildlife. As such it is operated so as to generally maintain the several purposes in balance, recognizing that from time to time one or another of the purposes will become paramount relative to the others. Congress directed the Corps to purchase fee simple title to lands rising to elevation 742′ m.s.l. between the dam and points where the elevations of the main bottom land along the main stem or principal tributaries lie at elevation 710′ m.s.l. All lands upstream from these points were to be purchased in fee simple to elevation 710′ m.s.l. and flowage easements between elevation 710′ m.s.l to elevation 742′ m.s.l. The reservoir flood control elevations are 706′ m.s.l. to 739.6′ m.s.l.

■ In preparing to acquire flowage easements from landowners the Corps iden-

tified those lands that in its opinion would have an "economic remainder" during the time the reservoir was in a flood control stage.[2] The measure of compensation for a flowage easement is the diminished difference in the fair market value of the land before compared to after acquisition of the easement. The appraisers who inspected the lands in question considered numerous factors and gave to the Corps and the landowners their conclusions as to the value of the lands, including to what purpose the economic remainder of the land could best be put after acquisition of the flowage easements. A part of the information used by the Corps and the landowners comprised a frequency and duration table derived from, among other factors, a computer-generated water release operation model entitled the "Preliminary Lake Regulation Manual."

Armed with this information the Corps began to acquire flowage easements. Landowners were told that the frequency and duration table should not be used as a guarantee of the impact of flooding on the flowage easements at any particular time; nor could they assume that the dam water release operational model would be adhered to strictly. Actual water release would be determined by contemporary events and factors and, because the data shown on the frequency and duration table was an average, flooding of their property would be either more or less than shown. The Corps described the frequency and duration table as follows:

> Reservoir elevation frequencies are only a statistical estimate based on past hydrologic experience. They do not constitute a prediction or expectation as to what flooding will occur at specific time on lands in the [area of the] reservoir. Nor are they a specific prediction of how the dam will be operated.

---

**2.** 42 U.S.C. § 4651, states that "[i]f the acquisition of only part of a property would leave its owner with an uneconomic remnant, the head of the Federal agency shall offer to acquire the entire property." The antithesis is axiomatic. Land with an economic remainder is land that would allow the owner to derive income by

some means from the property that would pay the taxes on the land and improvements, maintenance of the improvements, insurance and general upkeep needs of the property. It does not include income for the costs of living of the owner.

It was also made clear to the landowners that the frequency and duration table did not include natural flooding from Clear Creek and the Osage River, *i.e.*, non-dam source flooding, and that natural flooding should be expected to occur as in the past. The frequency and duration table was not the only factor used by the land appraisers. They analyzed and placed varying degrees of weight upon comparable sales, the extent of past natural flooding and the water release operation model. They also considered more objective factors such as natural conditions, topography, location, condition of and improvements to property and the existence and condition of levees.

The frequency and duration table read in conjunction with the water release model and other hydrological factors showed an estimated annual flooding duration of forty-one days to lands at 711′ m.s.l. and eleven days at 720′ m.s.l. The parties stipulated that flood waters had to reach 722′ m.s.l., the lowest portion of plaintiffs' levee, before plaintiffs' land would flood.[3] In actual operation of the dam, the Corps did not adhere blindly to the proposed operational model. Contemporary human judgment would play a large role in the daily operation of the reservoir. Indeed, the parties stipulated that actual operation of the dam could differ from the water release operational model because flexibility is necessary to account for unforeseen problems. The ability to exercise sound engineering judgment which might result in releases different from those shown in the operational plan was necessary.

The two tracts in dispute were the Ainsworth property and the Schmidt property. The Ainsworth property consisted of forty acres bordered on two sides by Clear Creek approximately 1.5 miles upstream of its confluence with the Osage River. Most of the property is between 710′ m.s.l. and 718′ m.s.l. and it is bordered on two sides by a levee designed to prevent natural flooding from Clear Creek and the Osage River but the levee has not always been successful. The tract has periodically flooded. At the time of the appraisal in 1977 the cropland area was under four or five feet of water and there was a break in the levee. No crops were grown on the land that year. The corps initially determined that it should purchase or take a 38.3 acre flowage easement and appraised the value of the flowage easement at $5,850. That sum was unacceptable to Mrs. Ainsworth. Following negotiations with her the Corps agreed to a price of $8,000. The effect of the flowage easement was reported by the appraiser as:

> There is approximately 1.20 acres below elevation 706′ which [are] located in streambed. The three acres between elevation 706′–710′ [are] located in Clear Creek and adjoining bank.

> The levee along the north and west side of Clear Creek is approximately 8′ high. Since the elevation along the bank is about 710′ and the levee is about 8′ high, this would indicate that the flood water must reach elevation 718′–720′ before it would breach the levee. This could happen about once every 3 years for a duration of 11 days.

> The three acre portion south of the creek is not protected by levee. This area is subject to frequent natural flooding. This area would flood from Truman Reservoir on an average of once every 1.4 years for a duration of 41 days, and as a result this area should not be used as cropland.

> It is a possibility a portion of the timber and brush land south and east of Clear Creek will be killed from flooding.

The highest and best use of the Ainsworth property before acquisition of the flowage easement was agricultural in conjunction with adjoining cropland. The highest and best use after acquisition was limited agriculture; *i.e.*, pastureland and recreation.

The Ainsworth flowage easement read in part:

> [The United States has] the perpetual right, power, privilege and easement oc-

---

**3.** At different times, and by different witnesses, the lowest elevation of plaintiffs' levee was set at 722′ m.s.l. or 722.5′ m.s.l. The court is of the opinion that both figures were correct, but at different times.

casionally to overflow, flood and submerge [the Ainsworth property] ... [and] improvements now situate on the land, except fencing and levees above elevation 706' m.s.l.; reserving, however, to the owner, his heirs and assigns, the right and privilege at the owner's expense to use and maintain the levee, now situate on the land; provided, however, that the aforesaid privilege of use and maintenance shall be totally subordinate to the absolute right of the United States, without notice and without incurring any liability of any nature whatsoever, to remove, breach, flood or otherwise damage or destroy in any manner whatsoever, the said levee.

The Schmidt property was comprised of approximately 416 acres and is partly adjacent to the Ainsworth property. Most of the land is below 712' m.s.l. Using the same process as described above for the Ainsworth property the Corps determined that it would acquire a flowage easement over 404 acres, leaving an economic remnant on those acres. One of the appraisers stated in his report that

[t]he highest and best use of the subject property after the imposition of the flowage easement will be limited agriculture and recreation. This change will be due to seepage from excessive water being put on the levee, the ponding of water inside of the levee system due to [poor] drainage and the possible chance the levee will break during the period of high water.

Paragraph fourteen of that report concluded that "[t]he unencumbered part of the remainder will not be affected. However, the easement area will probably have to be used for hay and pasture instead of row crops due to higher water table and the poorer surface drainage due to the lake level." The Corps Reviewing Appraiser summed up that in his professional opinion "any prolonged flood would damage the existing levees which would create a large expenditure for repair or change the highest and best use of the cropland to water tolerant grasses for hay and pasture. The easement will have little effect on the

recreational use of the property...." The bulk of the Schmidt tract was bottom cropland with a lake and sloughs in the center. The bottom land was protected from natural flooding to some degree by a surrounding levee, however, the levee had been breached in the past by natural floodwaters, and was not in good condition. In 1977, the bottom land had been entirely inundated from natural flooding and the levee breached in several places. A second appraiser noted that the levee would not protect against high flooding and, in particular, one defective drain would permit flood waters in Clear Creek to backup onto the property. Seepage from the levee and ponding inside the levee was to be expected during periods of high water. It is not disputed that the flowage easement lands were flooded, pre-dam, almost annually either by Clear Creek or the Osage River, or both, thereby rendering the properties marginal for agricultural use, especially row crops. At Mrs. Schmidt's request the Corps surveyed her levee and found that it did not exceed 725' m.s.l. and at one point dropped to 722' m.s.l. One appraiser estimated the value of the flowage easement at $129,300 and another appraiser at $126,000. The parties stipulated that the appraised values were within a reasonable range. Mrs. Schmidt was of the opinion that the Corps' estimated value of the easement was too low because it contained a factor for limited agricultural use of the economic remnant whereas she had concluded that use by the Corps of the flowage easement would completely destroy all agricultural use of the land leaving only recreation as the highest and best use. As a result, Mrs. Schmidt refused to sell the flowage easement to the Corps for less than $180,000. The Corps then executed a Declaration of Taking and Interlocutory Judgment that in practical terms gave it immediate title to the flowage easement, with its value to be resolved at a later date by negotiation or litigation. Negotiations were unsuccessful and the issue was set for litigation. The Corps eventually settled the litigation by paying Mrs. Schmidt $170,-

000 for the 404 acre flowage easement.[4] The Schmidt flowage easement read in pertinent part:

[The United States has the perpetual right] occasionally to overflow, flood and submerge the land lying above elevation 706' m.s.l. ... [and] the structures and improvements now situated on the land, except fencing above elevation 706' m.s.l.; reserving, however, to the owner, his heirs and assigns, the right and privilege at the owner's expense to use and maintain the levee and related water pumping system, if any, now situate on the land; provided, however, that the aforesaid privilege of use and maintenance shall be totally subordinate to the absolute right of the United States, without notice and without incurring liability of any nature whatsoever, to remove, breach, flood or otherwise damage or destroy in any manner whatsoever, the said levee.... The above estate is taken subject to existing easements ... reserving, however, to the owner, his heirs and assigns, all rights and privileges which may be used and enjoyed without interfering with the use of the project for the purposes authorized by Congress or abridging the rights and easement hereby acquired....

In plain English, both easements gave the Corps the perpetual and absolute right to occasionally flood the two tracts above 706' m.s.l. even if the flooding destroyed crops growing on those lands.

With complete knowledge of the foregoing, plaintiffs, in 1978, purchased the 40–acre Ainsworth property for $5,000 and the 416–acre Schmidt property for $100,-000.[5] Unfortunately for plaintiffs, beginning in 1981 and continuing through 1986, the land was flooded to such an extent that plaintiff claims it is without value for any purpose, having now no economic remnant; neither limited agriculture nor recreation. The cause, according to plaintiff, is that operation of the dam caused flooding, including natural flooding, to be much longer in duration than before the dam was built and that whereas crops that could sustain short term natural flooding could be grown with some success prior to the dam, no crops including deep-rooted water-hardy crops such as reed canary grass could survive the long-lasting flooding that occurred annually during the growing season since 1981. This, claimed plaintiff, constituted a total taking under the just compensation clause of the Fifth Amendment to the Constitution of the United States. *A fortiori*, defendant's original taking of a flowage easement was improper and, with the advantage of experience and hindsight, defendant should have, and must now, make just compensation to plaintiffs for a total taking of the property.[6] See footnote 2, *supra.*

The period from 1982 through 1986 was marked by high natural precipitation throughout the entire Osage basin and significantly above the average inflows to the reservoir as plotted by defendant using actual figures for the previous thirty-four years. The average inflow per year had been slightly in excess of six million acre feet.[7]

In 1982, due to natural precipitation, the inflow to the reservoir was eight million acre feet with the June 1982 inflow 100% and December 1982 inflow 200% greater

---

4. At trial, at the completion of plaintiffs' case, defendant moved for a directed verdict and in so doing argued that the higher payment to Mrs. Schmidt was for all agricultural uses of the property. If this was the case, it was certainly not recognized in the easement, nor did any witness support the argument. It was an argument without merit and the court will leave it without further comment.

5. Closing of the Schmidt property sale actually occurred in January 1979 but plaintiffs had taken possession in 1978.

6. Plaintiffs quantified their loss by alleging that the yearly flooding resulted in an actual taking of approximately 422 acres of the 468 acres owned at a fair market value of $600 per acre, taking into consideration the prior flowage easement, for a total of $253,000. Plaintiffs also allege they suffered damage to the remaining 46 acres of high elevation land in the amount of $500 per acre totalling $23,000. The total loss based upon diminution of fair market value is $276,200.

7. An acre foot is the amount of water needed to cover one acre of land to a depth of one foot.

than the monthly averages for the past forty-seven years. Natural precipitation in 1983 was also unusual. In April, October and November 1983 the monthly rainfall was well above the mean, with April experiencing 100% more precipitation than normal. Reservoir inflow in 1983 was in excess of eight and one-half million acre feet with April's inflow reaching the 400% mark. Rainfall in March, April, June and October of 1984 was significantly above the mean monthly rainfall for those months. As a result, 1984 inflow was over eight and one-half million acre feet. March and April inflow registered amounts equal to 300% and 200% of the average, respectively. Again in May, June, August, October and November 1985, rainfall was significantly above the mean monthly rainfall for those months with August and November over 100% greater than the mean. The 1985 inflow was fifteen million acre feet; almost 150% greater than the average annual inflow. February, March, June and November 1985 recorded, respectively, inflows of 600%, 300%, 200% and 500% greater than the forty-seven year average for those months. Precipitation in 1986 exceeded the norm with September and October well over 100% greater than the mean monthly rainfall for those months. Inflow for 1986 amounted to 11.5 million acre feet, a 95% increase over the norm. The October 1986 inflow neared 1000% of the forty-seven year average for that month.

For 1981–1985 the parties stipulated the elevations at the reservoir for each day of each year when the flood pool was twenty percent occupied, i.e., above 717' m.s.l. For 1981 the pool never rose to 722' m.s.l. (the height of plaintiffs' levee); in 1982 the elevation of the dam never rose above 721.58' m.s.l.; in 1983 the elevation at the dam caused flooding to exceed the levee on forty-three days; in 1984, three days and in 1985 the elevation at the dam exceeded 722' m.s.l. for twenty-eight consecutive days.

Plaintiffs contended that the Mmes. Ainsworth and Schmidt were mislead by the frequency and duration table into believing that they would have a more valuable economic remainder than was actually the case. Plaintiffs argued that the fre-quency and duration table greatly underestimated the number of flooding events and the duration of each because defendant did not adhere to the water release operational model. Plaintiffs also argued at one point that if the Corps had followed the water release model the reservoir would have been at a much lower level during 1981–1986 and certainly have lessened the duration of most flooding events. Defendant responded that it had no intent to maintain the level of the reservoir above the multipurpose pool level of 706' m.s.l. except to control downstream flooding and to minimize fish kill and, even then, the excess water would be released as quickly as possible so as not to flood the upstream flowage easements any longer than absolutely necessary.

## DISCUSSION

The principal issue before the court is whether the flooding effects of the operation of the dam were within the scope of defendant's flowage easements on plaintiffs' property. In addressing this issue the court must investigate the effect of the heavier than normal rainfall and, hence, inflows throughout the basin from 1981 through 1986, plaintiffs' maintenance of their levee, and whether in fact, there has been a destruction of the economic remainder.

Plaintiffs action is for inverse condemnation, that is, a suit against the United States to recover the value of the economic remainder of the property taken by the United States in the absence of any positive exercise of the power of eminent domain. Plaintiffs bear the burden of demonstrating by a preponderance of the evidence, i.e., that degree of proof which is more probable than not, that the operation of the dam was the direct and proximate cause of the prolonged flooding of their property and that that flooding destroyed the economic remainder. *Herriman v. United States*, 8 Cl.Ct. 411, 420 (1985) (citing *Loesch v. United States*, 227 Ct.Cl. 34, 53, 645 F.2d 905, 920, *cert. denied*, 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981)).

The elements of proof to show a taking by inverse condemnation through flooding are well established. Plaintiffs must prove that they owned a property right at the time of the taking, *Cooper v. United States*, 8 Cl.Ct. 253, 254–55 (1985), and that flooding has been intermittent, frequent and inevitably recurring because of authorized actions by defendant. *United States v. Cress*, 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746 (1917). To this test, in these circumstances, must be added the issue of whether the flooding was in excess of the scope of the flowage easements. Proof of damage alone will not suffice to prove a taking. *Loesch*, 227 Ct.Cl. at 44, 645 F.2d at 914. Moreover, taking claims must be decided on the particular facts of each case, *Herriman*, 8 Cl.Ct. at 417; *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 889 (Fed.Cir.1983), bearing in mind that the "concept of just compensation cannot be reduced to formula nor can it be confined to inexorable rules." *Georgia–Pacific Corp. v. United States*, 226 Ct.Cl. 95, 106, 640 F.2d 328, 336 (1980) (citations omitted). Takings cases must be resolved through reason in light of common sense and experience. *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). In the case at bar if the facts show that defendant's authorized operation of the dam caused intermittent, frequent and inevitably recurring flooding in excess of the scope of the flowage easements, a taking was effected. *Cress*, 243 U.S. at 328, 37 S.Ct. at 385, *Cooper v. United States*, 8 Cl.Ct. 253, 255 (1985).

Both easements are limited by law to the language of the easements and by reasonable use, *i.e.*, not a total use such as would destroy all uses of the economic remainder. *Cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982). Corps of Engineering Regulation 405–1–300 states, in part, that "[a]n easement is a property right of specified use and enjoyment falling short of fee ownership. It follows that the value of the easement is less than the market value of fee title." A Corps appraiser stated that he explained to Mrs. Schmidt[8] that the government did not buy her land and that if she so chose she could farm the land and use it for recreational purposes. She retained fee simple title to the property. The fact that Mrs. Schmidt rejected the initial Corps valuation of the economic remainder and chose to litigate that issue is not probative to show that defendant purchased all agricultural uses of the economic remainder. The court, instead, views Mrs. Schmidt's initial rejection as part of the normal give-and-take inherent in any negotiations to establish fair market value. Mrs. Schmidt eventually received more money for the flowage easement over her land than initially discussed for several reasons, including the time, costs and risks of litigation to defendant. Notwithstanding Mrs. Schmidt's belief that use of the flowage easement would destroy all agricultural use of the underlying property there has been no showing that the highest and best use of the economic remainder changed as a result of the agreement on the value of the flowage easement eventually reached by the Corps and Mrs. Schmidt.

■ Plaintiffs entered into the record the lay testimony of three nearby farmers to show the alleged total destruction for any purposes of their respective easement properties. As the sole trier of fact the court permitted the testimony with the knowledge that lay testimony would not be probative of causation but rather to hear the lay witnesses describe what they had personally observed on plaintiffs' land and nearby property. Causation of flooding is a complex issue which must be addressed by experts. *Herriman v. United States*, 8 Cl.Ct. 411, 420 (1985). Accordingly, the bulk of the lay testimony is accorded very little weight in the court's decision of the legal issues. *Id.* One witness testified that during the 1940's he had successfully farmed a major portion of plaintiffs' land. His testimony was that crops were grown on plaintiffs' property in the 1940's, 50's

---

8. The trial predominantly addressed the Schmidt tract because it was so much larger than the Ainsworth tract, however, discussion is focused on both except as specifically noted.

and to the mid–60's, without a levee. To put the witness' testimony into context, Corps photographs taken randomly over the years showed that prior to construction of the levees in 1965 two relatively small areas of the bottomland were under cultivation. The witness never remembered losing an entire crop in the 1940's on plaintiffs' land although one crop was damaged by flooding. The witness claimed to remember that flooding forty-five years ago was of "short duration." A Corps hydrologist, in commenting on the inflow and precipitation data, noted that several years in the 1940's were very similar to 1981 through 1986. That lay witness, while ostensibly remembering well what occurred some forty years ago could not, however, on cross-examination, remember several events during the proceeding six years. Another lay witness claimed that pre-dam natural flooding was of short duration; about one week from the Osage River and one to three days from Clear Creek. One lay witness also described for the court the condition of Clear Creek which forms the south and east borders of the Hendricks' property, as going through the "biggest changes in the last six or seven years as he has seen in his whole life."

> Pieces of the bank much bigger than this [court] room, [almost twenty feet by sixty feet] just [slid] in the river. It's just filling with mud, dirt, brush, trees, everything. It's just [silting full].... Clear Creek is hardly any stream at all anymore. It's just almost filled up with silt and mud.

Because Clear Creek has filled with silt and mud it was claimed that it cannot now hold water as it used to. Water from Clear Creek gets out onto the bottomland with even minor rains. He also noted erosion on plaintiffs' land because grass and other vegetation would not grow there. "It's eroding bad" and "all that's going right into Clear Creek and the Osage River." The trick, as explained to the court, to successful farming before construction of the dam was to plant and harvest the crops prior to when the land would normally be expected to flood from natural causes or to plant, hope that the flood would be of short duration, and harvest afterwards.

Another lay witness testified that there practically isn't any wildlife down in the bottoms. They can't survive there. The deer babies, they can't get out [of] there when [it floods] ... it's just practically ruined our wildlife down there. The trees are really dying all along the banks. They've already died and [fallen] in. Every year it kills more and more of them....[9]

Defendant's expert hydrologist made several very telling statements in his testimony. He related to the court how he developed the frequency and duration table by computer modeling the annual reservoir flooding events and elevations first for thirty-four years using flowage and other information then available to him and later for forty-seven years, including through 1986 relying upon actual inflows. That model reflected the reservoir pool levels and the flooding caused by higher levels. His data showed that at elevation 725.5' m.s.l., on the average, the Osage River would flood plaintiffs' easement more frequently than the reservoir. He also testified convincingly that the thirty-four year projections validated the average flooding frequency in the table over the six years in issue. When asked by counsel how much data would he need, as an expert, to comfortably project flooding averages he indicated that for frequency and duration he would have a high disregard for records for less than twenty years and would feel better if there were twenty-five years accumulation of data and even better with thirty years of data. "Set the standards, get as [much data] as you can and be highly suspect of records of less than [twenty] years." His most significant statement was that the past six years of data did not invalidate the frequency table. "When I examined the frequency curve, it still seemed to be very valid." He also checked the flood durations at various elevations that he had relied upon and they had not

---

9. As already noted on page 145, an appraiser did state there was "a possibility [that] a portion of the timber and brush land south and east of Clear Creek [would] be killed from flooding."

changed appreciably.[10] At one point plaintiffs asked defendant's expert hydraulics engineer about the combination of events that occurred over the past six years that resulted in floods of a duration which greatly exceeded the average as set out in the frequency and duration table. The witness testified that he "would expect it would be because as an average, we would have exceeded this occasionally, and we

10. A graphic example of the cyclical nature of inflows is best understood in court's Exhibit 34 which, as can be seen below, indicates the years of inflow from 1940 to 1986. Significantly, it shows a several-year period of high inflow into the Osage Basin from 1940–1945, similar to that in 1982–86.

ANNUAL INFLOW IN MILLION ACRE-FEET

CALENDAR YEAR

AVERAGE ANNUAL INFLOW

may exceed it more than one year in a row occasionally."

The Corps' hydrologist also testified that Clear Creek need not even rise to 722' m.s.l. for plaintiffs' land to flood. The pounding rain that occurred in the basin during the years at issue could easily flood plaintiffs' land because the land was so low and runoff would be trapped inside the levee, unable to escape because of the poor drainage system. Obviously, water could not escape from plaintiffs' land if the water in Clear Creek was as high or higher in elevation than the water inside the levee. This also happened as a result of the high inflows. For example, the hydrologist testified that on March 27, 1987, when he visited plaintiffs' property the reservoir was at 711.2' m.s.l. but the Osage River was in flood stage at 722' m.s.l. which had caused water to back up into Clear Creek and overflow the levee. This eleven-foot difference in water elevation in the river versus at the dam was the cause of that particular flood. Moreover, the water could not drain from plaintiffs' land because the water in Clear Creek was at the same elevation as water inside the levee. The same hydrologist testified, under oath, in a related condemnation case heard by the Land Commissioners, whose report was accepted by the United States District Court for the Western District of Missouri, Western Division, *United States of America v. 126.90 Acres of Land*, No. 78–0733–CV–W–1 (W.D.Mo. Mar. 10, 1982),[11] that

the most severe natural flooding for the easements imposed on the subject land is due to the Osage River.... From this [study] it was found that above elevation 729' m.s.l. flooding from the Osage River and from Truman Reservoir will occur with nearly the same frequency. Below elevation 729' m.s.l., flooding from the Osage River will occur more frequently than from Truman Reservoir.

Plaintiffs, it will be remembered, charged that defendant caused major flooding of long duration because it operated the dam differently than had been indicated in the water release operation model. Plaintiff argued that releasing water from the reservoir at a slower rate than projected kept the pool elevation higher than was necessary. Defendant characterized this argument as specious and the court agrees for several reasons. No project can be operated strictly in accordance with a set of computer variables. Plaintiffs, as did Mmes. Schmidt and Ainsworth, knew full well that the actual water release schedule would be at least somewhat different than as projected. In fact, however, for most years in question the actual releases were fairly close to the proposed releases, but as actually released resulted in less flooding than would have occurred had the water release operation model been blindly followed. Defendant testified:

basically our objective is to get rid of the storage as quickly as we can in a prudent manner so that its [storage capacity will be] there for future events and we have our flood control capacity. If [the reservoir] is full of water it doesn't do us any good.

The parties at trial agreed that for the years 1982 and 1984–1986 the release rate was almost identical to that projected in the model. For example, one of defendant's graphs plotted the simulated reservoir elevation and the actual reservoir elevation for the years 1981–1986. The simulated elevation represented the water level that would have been reached under a rigid application of the targeted releases in the water release operation model. The actual reservoir elevation represented the water level that was reached under operation of the project during those years. Those graphs show that in the years 1982, 1984, 1985 and 1986, the operation of the dam resulted in a lower pool than would have occurred by rigidly adhering to the water release operation model, although defendant's expert did testify that operation of the dam did to some degree add to the duration of the floods. In May and June, 1982, actual operation of the dam resulted in lower pool elevations than would have

11. Elmer Abbott, a party in *United States v. 126.90 Acres of Land*, was one of the lay witnesses who testified for plaintiffs in this case, as discussed above.

occurred under the simulated model. In May and June, 1984, actual pool elevations were below those of the simulated operation, reducing the duration of flooding above 716' m.s.l. by some fifteen days. Throughout the rest of 1984, actual pool elevations were either the same or lower than the simulated operation levels, except for a few days in December when the actual operation levels rose to 707–708' m.s.l. In 1985, actual and simulated operation were almost the same. In 1986, pool elevations for the actual dam operation were the same or lower than the simulation, except for short periods in February and April. In neither of those months did the actual elevations exceed 710' m.s.l. In sum, the court finds that operation of the dam in 1982, and 1984 through 1986 was not significantly different from the water release operation model.

The years 1981 and 1983 remain in question. In those years, which were characterized by defendant as start-up years, the Corps released water from the reservoir at a slower rate than had been displayed in the water release operation model. This caused flooding of longer duration of plaintiffs' flowage easement property than would have been the case otherwise. Defendant explained that in 1981 and 1983 the dam was operated with limited turbine capacity that resulted in floodwaters being passed solely over the spillway causing supersaturation of the water with nitrogen, a condition fatal to fish. Since 1983, however, there have consistently been at least four turbines in operation at the dam and the release of water through the turbines does not cause supersaturation. The court is satisfied that with this level of turbine capacity supersaturation will not be a recurring threat. The evidence is clear that the supersaturation problem experienced in 1981 and 1983 was of a temporary nature and has been resolved.

It is also true that plaintiffs' levees were poorly designed, constructed and maintained thus adding to flooding frequency and duration. The levees had steep slopes and were narrow at the top. A properly designed levee should be eight feet wide at the top and much wider at the bottom so as to provide a more gradual slope. One appraiser noted signs that it had breached in 1976. Defendant showed that breaches in the same area occurred in 1977 and again, as late as 1984. Plaintiffs admitted that as early as 1977, before they purchased the property, they knew the levees had breached frequently due to natural flooding. A 1977 aerial photograph showed that the levee had breached in the central northern section of the property, at the northernmost turn of the levee and on the east side. The pre-dam property suffered from poor internal drainage and was often wet as well. The practical effect of the levee breaches permitted Clear Creek to enter upon the lowlands and pond until the water level in Clear Creek dropped below the level of the drains in the levee which are at various elevations between 706' m.s.l. and 712' m.s.l. Between 1981 and 1986 Clear Creek frequently rose to and above 712' m.s.l., flooded the land, and ponded until Clear Creek and the Osage River fell below the level of the drains.

In 1970 the Osage River at its confluence with Clear Creek rose above 722' m.s.l. in early June and did not fall below 710' m.s.l. until the end of the month. The same event occurred in 1973 for approximately three months. We already know that the levee breached in 1977. Plaintiffs knew by the terms of the flowage easement that they were responsible for maintenance of the levee. Joe Hendricks' testified that "every year up until '86 [we would] push some dirt in some of the holes to keep some of the water out." Proper levee maintenance entails more than merely pushing dirt into a breach to keep some water out. The Corps' expert hydrologist testified that he examined the nature of the maintenance in 1987 and confirmed the court's suspicion that there had been little or no proper maintenance performed in the last five years and that the levee was uneven in height indicating both poor construction and maintenance. The natural result of this undermined the integrity of the entire structure. Once the levee breached at a low or poorly maintained site, the inrush of water would further erode the levee lead-

ing to a larger breach and higher inrush. In a very short period of time the level of water ponding on the bottomland would equal that of Clear Creek. The court, therefore, concludes that significantly long inundations of plaintiffs' land were proximately caused by poor levee construction and a lack of maintenance.

The court finds plaintiffs' argument that defendant has destroyed the market value of the economic remainder to be without merit. There is consensus that the value of farmland has gone down in the recent past. According to Joe Hendricks, an expert land appraiser, the price of farmland in that area peaked in 1981 and ever since then has been on a downward trend. That does not mean, however, that flowage easement lands are without value. Several factors lead to this finding. Plaintiffs, for example, sold less than half of the Ainsworth property to a third party for use as a homesite in 1983, one of the years when operation of the dam contributed to flooding of the easement land. For that sale the Hendricks received $4,000, a tidy profit. It is eighty percent of the price plaintiffs paid for the entire forty acres. The sale, which included thirteen acres of flowage easement land, was described by Joe Hendricks as a beautiful homesite, overlooking the entire valley. That is value.

Farming on bottomland has always been a gamble and the flowage easement raised the risk to the landowner significantly. Plaintiffs cannot challenge the scope of the original flowage easement because they were not the landowners at the time of purchase, *Cooper v. United States*, 8 Cl.Ct. 253, 254–55 (1985), nor can they challenge the original determination that the economic remainder would have only limited pasture and recreational uses. Their only hope is to prove a taking of the economic remainder of the flowage easement lands. Their order of battle was to prove that because they have been unable to reap a return in the past six years on their investment the land is worthless. The court has no doubt but that plaintiffs have not received any monetary return on their investment from agricultural pursuits after 1980 but that, by itself, is not sufficient to show

a taking by defendant's operation of the dam. At the time plaintiffs purchased the Ainsworth and Schmidt properties they knew the vast bulk of those lands were encumbered with flowage easements and that the highest and best use of the economic remainder consisted of limited agriculture and recreation. With this knowledge in hand Joe Hendricks testified that plaintiffs purchased the properties with "great hopes of turning it into a 100 cattle unit stock farm."

In 1980, the first full year of operation of the dam, plaintiffs harvested a "huge crop of beans and wheat." Joe Hendricks testified that:

> In 1980 we harvested wheat in the spring. We replanted soybeans, and we had an excellent crop, although it was a drought year, but the bottom had the moisture and I had the best bean crop of anyone that I ever heard of for a drought year.

A Corps' contract appraiser on the Schmidt portion of plaintiffs' property testified that it was foolish to sow wheat, a row crop, on easement land. Wheat is planted in the first part of October and harvested around the fourth of July when you are bound to have a flood. Even under normal conditions "you can in some years get away with it, [it] just depends upon whether you want to run the risk." In 1980, plaintiffs gambled and won. But, with hindsight, had plaintiffs sowed reed canary grass for pasture instead of row crops there was some likelihood that the grass might have reached a level of maturity to have survived a few of the floods of the following years. However, in 1981 and 1982 plaintiffs planted wheat on the flowage easement interspersed with fescue. In 1983, 1984 and 1986 they planted soybeans. Nothing was planted in 1985 because, according to Joe Hendricks, the land was under water most of the year. At trial he admitted that it was risky to sow row crops on the easement land and that to have done so was folly. During the same time period plaintiffs leased part of the flowage easement property to farmers who also tried unsuccessfully to raise row crops. In 1983,

1984 and 1986, plaintiffs gambled and lost. The fact that plaintiffs planted row crops that were destroyed by flooding, regardless of the source, cannot be used to argue that defendant had taken the economic remainder because the Corps, in purchasing the flowage easements, negated any liability to which it might otherwise be subject from the destruction of row crops by flooding. Joe Hendricks stated that he unsuccessfully sowed reed canary grass on the levee, "or" on the outflows of the levees but never attempted to sow it for pasture on the bottomland. Therefore, the court concludes that plaintiffs' inability to profit from row crops was within the protection of the scope of the easement purchased by the Corps. After gambling and losing, plaintiffs cannot now convincingly say otherwise.

The court also finds that the property does have recreational uses. Recreation is a broad term and need not be limited to commercially profitable recreation. *E.g., Kramer v. Government of V.I.*, 479 F.2d 350 (3d Cir.1973); *Harlan v. Frazier*, 635 F.Supp. 718 (W.D.La.1986), *aff'd*, 811 F.2d 601 (5th Cir.1987). The court has heard conflicting testimony from plaintiffs that the land has no recreational uses. It will be remembered that one of plaintiffs' lay witnesses testified without equivocation that there was no wildlife on plaintiffs' land. Joe Hendricks, on the other hand, stated that he had seen and hunted deer practically every year on the lowlands during the years in issue, albeit without success. "I've laid on those dikes many a cold morning trying to kill one across the dike, even." The important point is that he has seen deer on the property and has hunted them. His luck is regrettable but hardly supportive of a claim of no recreational value. The recreational value is in hunting with a chance of success. The taking of a deer would have been icing on the cake. One of the Corps' appraisers testified that he had seen deer tracks on the land "within the past few years."

Joe Hendricks also testified that after construction of the dam he gathered pecans from approximately 150 trees on the property, but has gathered none commercially since 1981. Once, before the reservoir was full, he gathered and sold as much as $1,200 worth of pecans. He also leased the land for between $600 and $300 for duck hunting up until 1985, then offered it free in 1986 because the hunters had not taken any birds during the years they leased it. Joe Hendricks also tried duck hunting himself but without luck. In all, the court finds that it cannot accept plaintiffs' claim that the land is devoid of recreational use. The facts belie the argument. Plaintiffs' uses of their land for personal recreational uses is a legitimate use for Fifth Amendment purposes. The land has recreational usages, even commercial value in the market place. The wildlife is there; it is luck that is missing. A hunter returning home empty-handed is not that unusual an event.

## CONCLUSION

Upon careful reflection and review of the entire record, the court opines that plaintiffs have failed to prove by a preponderance of the evidence that there has been a taking of the economic remainder of their property. The court finds that flooding in the years 1981 and 1983 was made more serious by defendant's slower releases from the reservoir so as to ameliorate the supersaturation of water pouring over the spillway. Since then enough turbines have come on-line that for all practicable purposes that event will never reoccur. Causation of flooding of the flowage easement by operation of the dam for that reason will not be inevitably recurring because of authorized action of the Corps.

As for 1982 and 1984 through 1986, the court finds that the flooding of plaintiffs' land was caused by astoundingly high precipitation which created natural flooding of Clear Creek and the Osage River and, on occasion, in conjunction with occasional high elevations of impounded waters at the reservoir. There is, however, insufficient evidence for the court to point to the dam and proclaim it the "cause" of the flooding of plaintiffs' land. Defendant, as well as plaintiffs knew that there could and most likely would be flooding of lands as high as 745' m.s.l. For this purpose the Corps pur-

chased flowage easements on all lands upstream of the main bottomland along the main stem and principal tributaries between 710' m.s.l. and 742' m.s.l. The first few years of plaintiffs' occupancy of the land saw few water problems. Plaintiffs were not heard to complain until the following six years of high precipitation. The court accordingly finds that the most significant factor causing the flooding was the high natural precipitation over the past six years with some undeterminable effect by the reservoir. A review of the facts and arguments of the parties leads the court to the inescapable conclusion that six years of flooding in these circumstances could occur and this was or should have been clearly understood by plaintiffs. A study of the past forty-seven years of precipitation showed that high precipitation with equally high inflows occurred in the 1940's and a few high years in between. Where the United States has purchased the absolute right to flood land "occasionally" plaintiff must prove that defendant has exceeded its occasional right to such a degree as to have taken the economic remainder. The court has no doubt but what there will be years in the future with equally heavy, or even heavier precipitation. There will also be years of light precipitation as well as drought years, such as 1980. Where experts in the field of science involved are skeptical of projections made from less than twenty data point years, the six-year timetable before the bar cannot persuasively invalidate the projections of the forty-seven year frequency and duration table. The court has found no case law on all fours with the one at bar that addresses the issue of "occasional" flooding of flowage easement land but, based upon defendant's case, the court must conclude that six years of flooding, correlated with heavy precipitation, is not unheard of in the geographic area. As discussed by defendant's expert hydrologist, whose testimony was not questioned on this point, several continuous years of flooding directly linked to the precipitation could reasonably be expected to occur over a period of forty-seven years. In fact, it occurred twice. Based upon the testimony of the expert hydrologist, and as supported by other testimony and documentary evidence, the court finds that six years of destructive flooding cannot, in the particular facts of this case, be construed as being outside of the scope of the flowage easements which gave the Corps the absolute authority to occasionally flood plaintiffs' easement property even though the operation of the dam clearly contributed to the flooding in 1981 and 1983 and contributed to a lesser extent for the other years in issue. To the contrary, the court concludes that the flooding that occurred in 1981–1986 was within the "occasional" limits of the flowage easements as purchased using the information shown in defendant's frequency and duration table. The easements gave defendant the absolute right to flood their bottomland to help contain upstream flooding. That right is exactly what the Corps purchased from Mmes. Schmidt and Ainsworth and what plaintiffs, in turn, purchased from them.

Finally, plaintiffs cannot be heard to cry "taking" when a significant element to the frequency and duration of the flooding must be assigned to their poorly designed and poorly maintained levees. The court has absolutely no doubt but that a significant number of flooding events and days of duration were caused by the uneven and poorly maintained levees and by poor drainage.

■ For the same reason, plaintiffs' claim for the taking of their crops sowed on the flowage easement property and destroyed by flooding must be denied. Testimony given at trial showed clearly that plaintiffs attempted to raise row crops on their property to the exclusion of establishing pastureland; the highest and best agricultural use left on the land. As the court has heard, farming itself is a gamble but farming flowage easement land is an even larger gamble especially when associated with abnormally high precipitation, the sowing of row crops and poorly designed and maintained levees. The loss of row crops in 1982 and 1984–1986 cannot be laid at the door of defendant. Likewise, contrary to plaintiffs' claims, the court finds that recreational purposes remain extant.

The court is convinced that within the context of the absolute right of defendant without liability to occasionally flood the flowage easements and destroy the crops that plaintiffs have failed to prove a taking by a preponderance of the evidence.

As plaintiffs are not the successful parties to the litigation, their claims for attorneys fees, costs and interest are denied. Uniform Relocation Assistance and Real Property Acquisition Act of 1970, 42 U.S.C. § 4654(c) (1982).

The Clerk of the court is directed to enter judgment in favor of defendant and to dismiss the complaint. Costs to defendant.