989 F.2d 499
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Earl COX, Elizabeth Cox, Tom Witt, Sue Witt, Kim Dees, Nancy
Dees, Richard Burger, and Jean Burger, Plaintiffs-Appellants,
v.
TENNESSEE VALLEY AUTHORITY, Defendant-Appellee.
 No. 92-5641.
 United States Court of Appeals, Sixth Circuit.
 March 15, 1993.
 
 Before RYAN and SILER, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiffs appeal the district court's grant of summary judgment in favor of Defendant Tennessee Valley Authority ("TVA"). The issues are whether the district court: (1) properly granted summary judgment in favor of TVA as plaintiffs failed to produce any evidence to establish essential elements of their inverse condemnation claim; and (2) properly relied upon certain portions of the affidavit of Gregory W. Lowe, a TVA employee, in ruling upon the parties' summary judgment motion. For the reasons herein, we AFFIRM the judgment of the district court.
 
 I.
 
 2
 Plaintiffs are homeowners in the Ocoee Estates subdivision in Polk County, Tennessee, which borders the Ocoee River about 1.7 miles downstream from TVA's Ocoee No. 1 Dam. TVA owns and operates four hydroelectric generating dams on the Ocoee River. Ocoee No. 1 Dam was purchased by TVA from the Tennessee Electric Power Company ("TEPCO") on August 15, 1939. See 1939 TVA Ann.Rep. at 63; 1940 TVA Ann.Rep. at 18.[1] There are five turbine generating units in the powerhouse of Ocoee No. 1 Dam. The dam consists of three sections: (1) a non-overflow concrete section, with an elevation of 837 feet above mean sea level; (2) an adjacent gated spillway section, with an elevation of 824.9 feet above mean sea level, consisting of four steel gates which are used to release water in excess of the turbine capacity when necessary; and (3) a fixed concrete arched spillway, with an elevation of 825 feet above mean sea level. Flashboards and superboards, designed to wash out sequentially when the reservoir behind the dam rises above their crest, are replaced when the lake levels recede. These have been installed on the arched spillway of Ocoee No. 1 by TEPCO and have been operating since 1939.
 
 
 3
 Ocoee No. 1 is operated between headwater elevations of 827 feet and 829 feet yearly from May through October. The reservoir is then drained down by the operation of the turbines to provide storage for the higher winter flows. Under the operating guide, the normal minimum desired level in the winter is at an elevation of 820 feet, and the normal maximum desired level in the summer is 829 feet. The reservoir is located in mountainous terrain, and rapid fluctuations in reservoir headwater levels are common. Plaintiffs argue that a change in TVA policy regarding the operating levels of Ocoee No. 1 reservoir in 1989 or 1990 caused the flooding of their homes. TVA asserts, however, that the policy has remained the same since 1939.
 
 
 4
 In the fall of 1989, TVA undertook a major rehabilitation of the turbines at Ocoee No. 1, which had been in place since 1914. The rehabilitation of the 75-year-old turbines was necessary, as they were inefficient by current standards and allowed excessive leakage. In addition, many of the electrical components associated with the turbines needed to be replaced and updated. This rehabilitation, which had never been done before at the plant, required the physical removal of the five turbines from the dam. Unit 1 was removed from service on November 13, 1989; Units 2 and 3 were removed on December 4, and December 18, 1989, respectively; and Units 4 and 5 were removed from service on February 5, and January 16, 1990, respectively. The turbine rehabilitation program was completed in 1991, with all units returning to service. TVA has no plans to remove the units from service again. These turbines are the primary means of passing water from the dam and regulating the reservoir levels behind the dam. If the turbines are out of service, the spillway gates are the only method to release water from the dam. To control the reservoir level, all of the steel spillway gates were opened on December 12, 1989, and remained fully open until the spring of 1990 when the reservoir operated at its higher summer pool levels. Without the turbines, TVA has no means of lowering the Ocoee No. 1 level below the crest of the gated spillway. Thus, while the turbines were out of service, the reservoir operated at higher levels in the winter of 1989 and spring of 1990 than in past years. However, as the turbines are back in service, the reservoir is operating at its normal seasonal cycle.
 
 
 5
 There is no river stage level gage in the Ocoee River at plaintiffs' properties. However, a gage located closely upstream is maintained by the United States Geological Survey ("USGS"), Department of the Interior. When the Ocoee No. 1 turbines are running at full capacity, the river stage is about 6.3 feet in a nonflood situation. Plaintiffs allege that a taking of their properties occurred as the result of flooding on October 1, 1989, February 16, 1990, March 17, 1990, and December 24, 1990. On those dates, the USGS gage measured high water levels of 12.86 feet, 24.76 feet, 17.59 feet, and 12.57 feet, respectively. Plaintiffs' homes are located in a flood plain and have been frequently naturally flooded in the past. The worst flood on record in the area occurred before any of the dams were built. According to the USGS gage, river levels higher than those existing on October 1, 1989, and December 24, 1990, have occurred at least 37 times during this century. Moreover, it is undisputed that plaintiffs' homes were extensively flooded in March 1980 while the previous owners occupied the homes.
 
 
 6
 On October 1, 1989, while the remainder of Hurricane Hugo passed through East Tennessee, flooding occurred on plaintiffs' property. From September 28, 1989, to October 1, 1989, an average of over six inches of rain fell on the Ocoee River watershed above Ocoee No. 1. During the storm, the reservoir filled, reaching a peak of 831.8 on October 1, 1989, and, thus, retained about three feet of water which otherwise would have gone downstream to plaintiffs' properties. TVA ran the turbines continuously from September 29, 1989, through October 6, 1989, to reduce the headwater level behind the dam. TVA opened all four spillway gates from September 29, 1989, through October 3, 1989, and closed them after the reservoir had reached a 827.8 level.
 
 
 7
 On February 16, 1990, an unprecedented storm occurred, and Polk County, Tennessee, was declared to be a federal disaster area. The Federal Emergency Management Agency stated that the storm was the "worst flooding in almost forty years." As a result of the disaster, nine deaths occurred and 5000 people were evacuated from their homes. At the beginning of the storm, Ocoee No. 1 reservoir was at approximately elevation 829.4. The highest headwater elevation was recorded at 835.2 on February 16, 1990. During this period, the superboards over the arched spillway washed away, and the flashboards were flattened as planned.
 
 
 8
 On March 17, 1990, another period of heavy rain occurred and nearly five inches of rain fell in the Ocoee No. 1 watershed. At the beginning of the storm, the reservoir was at elevation 826.4 and rose through the storm to a 831.7 elevation. Nearly all of the water entering the reservoir passed over the arched spillway or through the open spillway gates.
 
 
 9
 On December 24, 1990, a storm caused 4.1 inches of rain to fall between December 20, 1990, and December 23, 1990. At the beginning of the storm, Ocoee No. 1 was at elevation 827.9 and rose to elevation 832.4 on December 24, 1990. The flashboards and superboards had been reinstalled in June and remained in place during that storm.
 
 
 10
 Plaintiffs' complaint alleged that: (1) TVA inversely condemned their property by causing flooding on four occasions in late 1989 and early 1990; (2) such flooding resulted from a change in TVA's method of operation of Ocoee No. 1 Dam; (3) future flooding due to TVA's operation of its dams will be "intermittent but inevitably recurring"; and (4) such flooding is a "taking" under the Fifth Amendment to the United States Constitution.
 
 
 11
 Plaintiffs moved for summary judgment as to liability, which was supported by an affidavit of Earl and Elizabeth Cox.[2] Then, TVA moved for summary judgment, which was supported by five affidavits. The TVA affidavits supported its theory that it was not responsible for the flooding, and that the flooding was temporary and unlikely to recur. Plaintiffs moved to strike TVA's affidavits, as they contained: (1) opinion evidence of experts not earlier disclosed; (2) hearsay; (3) self-contradictory statements; and (4) inconsistent statements. Plaintiffs did not submit any affidavits to counter TVA's allegations. The district court denied the motion with respect to the affidavits of Marshall W. Smith and William D. Felts and portions of Lowe's affidavit, which the court found contained facts and not opinions. The remaining portions of Lowe's affidavit and the remaining affidavits of Harold R. Henry and Treasure H. Rogers, Jr. were not necessary to a determination of summary judgment and the court did not determine their admissibility. Thus, the district court granted TVA's motion for summary judgment, as plaintiffs presented no evidence that TVA caused the flooding of their property.
 
 II.
 
 12
 Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'
 
 
 13
 Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988). This court reviews a grant of summary judgment de novo. Brooks v. American Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991).
 
 III.
 
 14
 Private property shall not be "taken for public use[ ] without just compensation." U.S. CONST amend V. There is a distinction, however, "between damage and taking, and that distinction must be observed in applying the constitutional provision." Bedford v. United States, 192 U.S. 217, 224 (1904). Only a "taking" is compensable under the Fifth Amendment; damages resulting from lesser invasions are not. See Hartwig v. United States, 485 F.2d 615, 619 (Ct.Cl.1973). Not all flooding caused by the government rises to the level of a taking. See Danforth v. United States, 308 U.S. 271, 286-87 (1939); Sanguinetti v. United States, 264 U.S. 146, 150 (1924). To prove a taking by flooding, a landowner must show either that the government has "effectually destroy[ed]" the land, Pumpelly v. Green Bay & Mississippi Canal Co., 80 U.S. (13 Wall.) 166, 181 (1871), or that the government has subjected the land to "permanent liability to intermittent but inevitably recurring overflows." United States v. Cress, 243 U.S. 316, 328 (1917). The "permanent, intermittent flooding which amounts to a taking must be frequent." Barnes v. United States, 538 F.2d 865, 870 (Ct.Cl.1976). The inevitably recurring flooding must be directly attributable to the government's action. See Danforth, 308 U.S. at 286; Sanguinetti, 264 U.S. at 150; Owen v. United States, 20 Cl.Ct. 574, 583 (1990). The plaintiff bears the burden of proving that the government's actions were the direct and proximate cause of the damage, id. at 574, and the government's actions must have caused worse flooding than would have occurred due to the forces of nature. United States v. Sponenbarger, 308 U.S. 256, 266 (1939).
 
 
 15
 Plaintiffs proferred the affidavit of Mr. and Mrs. Cox, parties who admittedly had no personal knowledge of the causes of the flooding. The affidavit stated that: (1) the house was not flooded between mid-1980 and 1989; (2) the water levels in the Ocoee No. 1 reservoir were higher in 1989 than in the past; and (3) the house flooded in 1989 and 1990. However, the courts "have rejected a post hoc ergo propter hoc approach to proving causation." Owen, 20 Cl.Ct. at 584. Instead, causation of flooding is a complex issue which must be addressed by experts. Herriman v. United States, 8 Cl.Ct. 411, 420 (1985). Further, a temporary invasion is insufficient to constitute a "taking." See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 428 (1982). "[T]o create an enforceable liability against the Government," the flooding must "constitute an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property." Sanguinetti, 264 U.S. at 149.
 
 
 16
 Plaintiffs have not alleged that their property has been permanently submerged. Instead, it is undisputed that three of the four plaintiff families continue to live in the residences in which they claim TVA has taken, and the fourth home is being leased. Further, it is undisputed that since the turbines were reinstalled in 1991, the lake levels have returned to their former, normal range. Thus, assuming that higher lake levels behind the dam caused plaintiffs' property to flood in 1989 and 1990, the condition was temporary and could not constitute a "taking" as a matter of law. Hendricks v. United States, 14 Cl.Ct. 143, 155 (1987).
 
 
 17
 Accordingly, the district court properly stated that "[t]o establish a claim for a taking under the Fifth Amendment as a result of flooding of private property, plaintiffs must prove that TVA, by its construction and operation of the four dams on the Ocoee upstream from plaintiffs' property ... raised the level of the water in the Ocoee river at the site of plaintiffs' property above its 'natural level,' and the higher water level caused the flooding of plaintiffs' property on the dates in the complaint." See Cress, 243 U.S. at 325. "[I]n order to create an enforceable liability against the Government, it is, at least, necessary that the overflow be the direct result of the structure, and constitute an actual, permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property." Sanguinetti, 264 U.S. at 149.
 
 
 18
 However, plaintiffs argue that summary judgment is inappropriate, as "material issues of fact[ ] [exist] as to whether flooding was in fact permanent or inevitably reoccurring, and whether flooding was [the] result of government taking." Turner v. United States, 901 F.2d 1093, 1093 (Fed.Cir.1990). In Turner, the government "did not attempt to 'point out' to the [court] or to Turner the alleged absence of evidence on the issue of whether the flooding was permanent or inevitably recurring." Id. at 1096. Thus, "Turner had no reason to respond or to obtain affidavit evidence concerning a matter not raised by the government's summary judgment motion." Id. Accordingly, the court held that summary judgment was precluded "on the present record." Id. at 1097.
 
 
 19
 In the present case, however, plaintiffs stated that the "inevitable consequences of this policy of TVA is that Plaintiffs will be flooded again, in view of the continuously high lake levels." TVA responded by filing affidavits in support of its summary judgment motion, which maintained that the flooding would not continue, as the turbines were replaced and would not be removed again.
 
 
 20
 Plaintiffs have failed to show that TVA's actions resulted in a permanent liability rather than temporary flooding. See Loretto, 458 U.S. at 427-28; Cress, 243 U.S. at 327-28. Thus, even assuming that higher lake levels behind the dam in 1989 and 1990 caused plaintiffs' property to be flooded, the condition was temporary and is not a "taking" as a matter of law. Hendricks, 14 Cl.Ct. at 153.
 
 IV.
 
 21
 Plaintiffs argue that: (1) Lowe was an "expert" witness whose affidavit consisted of opinions; (2) they had not been able to take discovery of Lowe as they were unaware that he was an expert until TVA's summary judgment motion was filed; and (3) Lowe's testimony should have been excluded. Instead, the district court held that Lowe's affidavit met the Fed.R.Civ.P. 56(e) Rule, as Lowe: (1) has been employed by TVA for nearly 20 years; (2) had personal knowledge of the precipitation that occurred on the Ocoee watershed, the headwater levels in Ocoee No. 1 during the four flooding dates, and the river levels closest to plaintiffs' property.
 
 
 22
 Lowe's affidavit contained facts taken from official government records, including that: (1) the USGS maintains a river stage level gage approximately 1.3 river miles from plaintiffs' property; and (2) the USGS gage readings showed that river levels higher than those existing on October 1, 1989, and December 24, 1990, have occurred at least 37 times during this century. TEPCO readings are admissible either as: (1) business records under Fed.R.Evid. 803(6); or (2) documents more than twenty years old in TVA's possession under Fed.R.Evid. 803(16). The district court did not abuse its discretion in determining that Lowe's affidavit met the Fed.R.Civ.P. 56(e) Rule, as Lowe: (1) has been employed by TVA for nearly 20 years; and (2) had personal knowledge of the precipitation that occurred on the Ocoee watershed, the headwater levels in Ocoee No. 1 during the four flooding dates, and the river levels closest to plaintiffs' property.
 
 
 23
 While Lowe has expertise about flooding, he is not an expert retained by TVA for the purposes of testifying at trial. Instead, he is a veteran TVA employee with substantial knowledge pertaining to this case. "[T]he expert whose information was not acquired in preparation for trial but rather because he [or she] was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit ... should be treated as an ordinary witness." Fed.R.Civ.P. 26 advisory committee's note. Thus, Lowe is not considered to be an "expert" for discovery purposes, especially as he has personal knowledge about the events which are the subject matter of the lawsuit. Even though TVA listed Lowe as a potential witness in both its September 1991 preliminary witness list and its December 1991 final witness list, plaintiffs chose not to take his deposition during discovery.
 
 
 24
 Plaintiffs have asserted that Lowe did not have personal knowledge regarding his testimony. As this issue is raised for the first time on appeal, this court will not review it. First Nat'l Monetary Corp. v. Weinberger, 819 F.2d 1334, 1339 (6th Cir.1987). Even if not waived, the argument is meritless, as "[k]nowledge acquired through others may still be personal knowledge within the meaning of Fed.R.Evid. 602." Agfa-Gevaert, A.G. v. A.B. Dick Co., 879 F.2d 1518, 1523 (7th Cir.1989).
 
 V.
 
 25
 Plaintiffs argued, in seeking reconsideration, denied by the district court, that the flow of water over the Ocoee No. 1 spillway caused a "hydraulic jump," which raised the tailwater levels at the Ocoee No. 1 dam. Although plaintiffs requested judicial notice of this jump, the district court declined to take notice of this fact, as plaintiffs failed to show that this purported fact is "not subject to reasonable dispute." Fed.R.Evid. 201. Further, the district court held that plaintiffs had not shown the relevance of the hydraulic jump to the USGS gage measurements downstream of the dam. Thus, the lack of relevance is an appropriate basis for declining to take judicial notice of a purported fact. Vallot v. Central Gulf Lines, Inc., 641 F.2d 347, 351 (5th Cir.1981). Plaintiffs argue that judicial notice should be taken of this jump. "However, judicial notice should not be used as a device to correct on appeal an almost complete failure to present adequate evidence to the trial court." United States v. Campbell, 351 F.2d 336, 341 (2d Cir.1965), cert. denied, 383 U.S. 907 (1966).
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 TVA's annual reports to Congress and the President, required by 16 U.S.C. § 831h(a) (1988), are subject to judicial notice. E.g., Illinois Cent. R.R. v. Tennessee Valley Authority, 445 F.2d 308, 310 n. 4 (6th Cir.1971)
 
 
 [2]
 Although the motion was filed only on behalf of the Cox's, the arguments in plaintiff's supporting brief were common to the other plaintiffs, and the district court treated the motion as having been filed by all plaintiffs